PHILLIP A. TALBERT
Acting United States Attorney
PAUL HEMESATH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>      v.<br><br>SERGEY TKACHUK,<br><br>                Defendant. | CASE NO. 2:16-CR-00242-KJM<br><br>SENTENCING MEMORANDUM<br><br>DATE: July 12, 2021<br>TIME: 9:00 a.m.<br>COURT: HON. KIMBERLY J. MUELLER |

## I.     INTRODUCTION

The government asks the Court to impose a sentence of 60 months of imprisonment, which is a sentence well above the sentencing guidelines as set forth in the PSR. The government is requesting an upward variance in this case because a death resulted from defendant Sergey Tkachuk's distribution of fentanyl to victim G.B.

Tkachuk was not charged under 21 U.S.C. § 841(b)(1)(C), which would have resulted in a 20-year mandatory minimum sentence. Furthermore, the government agreed not to seek the Guidelines enhancement under § 2D1.1(a)(2), which would have automatically imposed a base offense level of +38, which would have resulted in a Guidelines range of 210-262 months.

The government does, however, seek an upward variance to 60 months of imprisonment pursuant to § 5K2.1 and 18 U.S.C. § 3553(a) for the reasons set forth below.

## II. Background of the Death Underlying the Justification for an Upward Variance

The PSR sets forth the facts surrounding the death of G.B. in paragraphs 1 to 23.

In summary, Tkachuk sold G.B. pills that—unbeknownst to Tkachuk—contained fentanyl. G.B. consumed an unknown number of the pills and then was taken to the hospital to be treated for an acute overdose. Against the doctor's advice, he was released after recovering. The next day G.B. again took pills the pills previously supplied by Tkachuk, and he was again taken to the hospital. He died on March 28, 2016.

The parties agree that Tkachuk supplied G.B. with the pills (marked as M367—a pill known as a "Norco" but actually branded as Lortab—both contain a hydrocodone, a controlled substance). The parties also agree that G.B. died from an acute fentanyl overdose, but there is no evidence showing that Tkachuk knew the M367 pills were counterfeit or contained fentanyl.

## III. The Law Provides Various Options to Fairly Punish Persons Who Have Provided Drugs Leading to Death.

Federal law imposes severe punishment on persons who distribute drugs that result in death. First, 21 U.S.C. § 841(b)(1)(C) defines a 20-year mandatory minimum sentence for federal drug offenses (such as distribution) if "death or serious bodily injury results from the use of such substance."[1] Second, § 2D1.1(a)(2) of the Sentencing Guidelines specifies that the base offense level shall be +38 when the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance.

In addition to these penalties, the Sentencing Guidelines contains a policy statement allowing for an upward variance in the case of a resulting death: "If a death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1. The Guidelines go on to advise that a substantial increase in sentence could be justified by knowing risk of injury *or* if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of injury. *Id.*

Furthermore, sentencing factors contained in 18 U.S.C. § 3553(a) contain the following subpoints (among others) that should cause this Court to consider application of an upward variance: (1)

---

[1] Any charge that results in a higher maximum penalty or mandatory minimum must include the allegation in the charging document.

GOV. SENTENCING MEMORANDUM 2

the nature and circumstances of the offense, (2) the need for the sentence imposed to reflect the seriousness of the offense, and (3) to afford adequate deterrence to criminal conduct.

In this case, in which Tkachuk sold drugs that resulted in 18-year-old G.B.'s death, it would not do justice to the Guidelines or to the victim's family to impose a sentence that would equal the punishment had the death or serious injury not occurred. It is in these circumstances—for which the consequences of a crime could not be more serious, for which the need for deterrence is at the maximum, and in which the government has exercised extreme restraint—that the Court should exercise its discretion under both § 5K2.1 and Section 3553(a) to vary upward to a fair sentence.

### IV. The PSR's Legal Reasoning for not Recommending an Upward Variance is Flawed.

While finding that G.B. ingested Tkachuk's fentanyl-laced M367 tablets and that G.B. subsequently died in a hospital due to opioid intoxication, the TSR recommends that an upward variance is not warranted under § 5K2.1 for two reasons: First, Tkachuk was unaware the pills he sold contained fentanyl; and second, that "many different factors contributed to the victim's death." PSR at ¶ 101.

As to the first reason, the government acknowledges that there was no evidence to show that Tkachuk knew that the pills contained fentanyl. However, not knowing does not absolve Tkachuk of the recklessness-leading-to-death that is the basis for the government's request for an upward variance. If the government were to have charged Tkachuk under 21 U.S.C. § 841(b)(1)(C)—the charge that would have resulted in a 20-year mandatory minimum—lack of knowledge of whether the pills contained one controlled substance or another would not be a relevant defense to the charge. While the Court should take Tkachuk's lack of knowledge into consideration, it should not be a reason to ignore the death that occurred in this case.

Furthermore, the text of § 5K2.1 advises that a substantial increase in sentence could be justified by knowing risk of injury *or* if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of injury. Here, both factors are present. Even if Tkachuk believed that the pills only contained hydrocodone, he knew (or should have known) the risks of selling Schedule II controlled substances to 18-year old persons. Thus, not knowing the fentanyl was in the pills is only partially extenuating as to the first factor. For the second, the base offense levels underlying the offense (distribution of fentanyl) do not reflect an increase for death or bodily injury. Accordingly, § 5K2.1

appears to contemplate Tkachuk's circumstances—even if he did not know that fentanyl was present.

As to the second reason, the PSR points to the existence of other "factors" surrounding G.B.'s death as reason to discount the M367 fentanyl pills as a cause of G.B.'s death. The PSR lists those factors as:

- "The victim initially went to the hospital for an overdose and was discharged against the advice of doctors."
- "The victim subsequently took additional pills and overdosed again which led to his death."

PSR at ¶ 101.

G.B. did take the pills a second time, and he was released from the hospital despite medical advice, but refusing to recognize § 5K2.1 (death resulting) because other factors were present would eliminate upward variances from any case involving a drug addict, an obese person, a person with underlying medical conditions, or a person of advanced age. Furthermore, the text § 5K2.1 does not require the defendant's acts to be the sole or even the primary cause of death—merely that, "If a death resulted, the court may increase the sentence above the authorized guideline range." In this case, there can be no doubt that "a death resulted" from the distribution of fentanyl-laced pills and the Guidelines leave the Court with the discretion to decide, based on the circumstances, how much of a variance is appropriate. While the Court may consider that G.B. took the pills a second time and that he chose to go home instead of seeking additional care, these circumstances do not obviate the need for a sentence in excess of what Tkachuk would be facing for the weight of the drugs alone.

In summary, § 5K2.1 allows the Court to fairly assess the role of Tkachuk in the death of G.B. The government asks the Court to vary upward from the bare Guidelines (which do not otherwise take it in account) to give the appropriate and just weight to a drug deal that resulted in the death of a young person.

V.   **A 60-Month Sentence Fairly Accounts for All Aggravating and Mitigating Factors in This Case.**

The government acknowledges that there are facts that mitigate Tkachuk's conduct. Although he initially fled, Tkachuk did eventually cooperate with police. Furthermore, the parties acknowledge that there is no evidence showing that Tkachuk knew that the pills were counterfeit or contained fentanyl.

Unlike cases in which vendors cut drug-powders with unknown substances, these pills were pressed to appear to be legitimate M367 pills.  Finally, Tkachuk has testified about his knowledge of the circumstances surrounding his receipt of the pills, and he has agreed to continue cooperating in this case.

In aggravation, however, the death of the recipient of the pills, 18-year old G.B., cannot be overstated.  On an individual level, G.B. left behind parents, a brother, and friends.  Even years later, G.B.'s family suffers the devastation wreaked by the death of their young son and brother.

From a national perspective, tens of thousands of Americans die from opioid overdoses every year, and the number continues to rise (estimated to be over 50,000 deaths for 2020).  As the Centers for Disease Control and Prevention said at the end of 2016, "[t]he U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999 – 2014."  "Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010-2015," Morbidity & Mortality Weekly Report vol. 65 (Dec. 30, 2016) at 1445.  Opioid overdoses account for the majority of those deaths:  in 2014, opioids were involved in 28,647 (60.9%) of the 47,055 drug overdose deaths nationwide; in 2015, opioids were involved in 33,091 (63.1%) of the 52,404 deaths.  *Id.*  Much of the recent increase is due to semi-synthetic and synthetic opioids such as heroin and fentanyl.  *Id.*  But the majority of deaths are due to opioid pain relievers, such as pills containing hydrocodone and oxycodone; in 2015, approximately 22,598 of the 33,091 overdose deaths related to opioids involved opioid pain relievers.  "National Overdose Deaths from Select Prescription and Illicit Drugs," Nat'l Inst. on Drug Abuse, at https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (last visited Apr. 18, 2017).  Moreover, pills remain a powerful risk factor for heroin use.  In a 2013 study, almost 80% of current heroin users reported prior non-medical use of prescription pain relievers.  "Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States," in Center for Behavioral Health Statistics and Quality Data Review, Substance Abuse & Mental Health Serv. Admin. (Aug. 2013) at 10 & table 3.  In other words, opioid pain relievers not only kill more people than all illicit drugs combined, they are also the gateway to the illicit opioids—heroin and fentanyl—that kill with stunning frequency.  And of course, pills that counterfeited to look like pharmaceutical pain pills, but contain fentanyl, are even worse.  Drug dealers selling opioid pills are thus necessarily reckless with their customers' lives in exchange for profit.

But base-offense levels for drug-distribution are often vanishingly low if police find only the drugs associated with the death.  The reason for this is that drug sentences are driven by the weight of the drugs attributable to the defendant.  But in death and injury cases, the law provides for an additional measure of punishment.  If the Court does not impose that additional measure, as is contemplated by § 5K2.1 and Section 3553(a) factors, then the profound consequences of drug dealing and its effect on our country are lost, and victim families are left wondering about whether justice was served.

The government has carefully examined the options available to prosecute this case, ranging from a 20-year mandatory-minimum sentence to the only other available option: a distribution charge based on the weight of the sold drugs, but with the plea agreement specifying that the government would be seeking an upward variance to take into account the death that would have otherwise resulted in a 20-year sentence.[2]  A non-mandatory-minimum sentence under Section 841 is far below what Tkachuk would face had he been formally charged with the death under 21 U.S.C. § 841(b)(1)(C), but his sentence not be limited to the weight of the drugs sold to G.B. on that day.  It should also consider the death that resulted from his reckless drug transactions and the grieving family that was left behind.

### VI.   CONCLUSION

The federal drug laws, Section 3553(a), and the Sentencing Guidelines all recognize that crimes resulting in a death should be treated differently.  Here, the government asks the Court to recognize the death of G.B., and therefore vary upward to a sentence of 60 months, which is fair and reasonable considering the circumstances present in this case.

Dated:  July 6, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By:  /s/ PAUL HEMESATH
PAUL HEMESATH
Assistant United States Attorney

---

[2] The government's decision in this case was based on the unique factors presented in this case and should not be considered a basis for decisions in future cases.